Maurice SIGARD, Appellant,

v.

The STATE of Texas, Appellee.

No. 51467.

Court of Criminal Appeals of Texas.

June 9, 1976.

Rehearing Denied June 30, 1976.

Sam C. Bashara, San Antonio, for appellant.

Ted Butler, Dist. Atty., Gordon V. Armstrong and Susan Spruce, Asst. Dist. Attys., San Antonio, Jim D. Vollers, State's Atty., and David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This is an appeal from a conviction for the offense of sale of heroin under the former Penal Code. In a bench trial the court assessed punishment at life, the punishment being enhanced under the provisions of Article 63, Vernon's Ann.P.C., 1925.

Appellant urges six grounds of error concerning the absence of an alleged informer, Jimmy Levine [1] aka Jimmy Martinez, Jimmy Martinez Levine, Jesse or Jesus Contrares. He contends the court erred in overruling his motion to dismiss the prosecution, his motion to abate the prosecution, his motion to suppress evidence, his third motion for continuance, and further contends he was denied compulsory process of wit-

1. Throughout the transcription of the court reporter's notes we find the name spelled "Levine," but elsewhere in the record it is spelled "Leveine" as it was in *White v. State*, 517 S.W.2d 543 (Tex.Cr.App.1975).

738

nesses and denied due process when the court refused to require the State to produce Jimmy Levine as a material witness for the defense. The failure of this same individual to appear as a witness was presented in *White v. State,* 517 S.W.2d 543 (Tex.Cr.App.1975).

A review of the hearing on all pre-trial motions held on May 22, 1975, concerning the absence of Levine is necessary to fully appraise appellant's contentions. The alleged primary offense is shown to have occurred on July 10, 1972, and the indictment upon which the appellant was tried on May 22, 1975, was returned on March 8, 1973. It does not appear to have been the first indictment returned in connection with the alleged offense.[2]

Albert Chevera testified he worked as an undercover agent for the San Antonio Police Department and that Levine accompanied him on nearly all of the 138 cases he made. He testified that Levine was with him on July 10, 1972, when they encountered the appellant Sigard while they were looking for another individual. Sigard asked Chevera if he wanted to "score." Chevera gave Sigard $30.00 and all three got in a car and Sigard directed him to another location where Sigard left Levine and Chevera in the car and returned a few minutes later and handed a yellow balloon to Chevera which was later shown to contain heroin.

Chevera testified that he knew Levine as Jimmy Martinez and "a bunch of names," but didn't know where he lived but always met him at pre-arranged locations. He stated he had not seen Levine since "right before I quit working undercover." He did not know where Levine was.

Preston Slocum, Jr., of Houston testified he was a San Antonio police lieutenant on July 10, 1972. He knew that Levine was working with Chevera as an informant and

was being paid between $35.00 and $50.00 for each case made. He could not recall the date he last talked to Levine over the telephone, but thought it was late August or early September, 1972, just before a narcotics roundup, which apparently, although not clearly established, resulted from the cases Levine had assisted in making. Levine told Slocum that he was going to leave town, and Slocum replied that he "thought that was a good idea" and told Levine he would send him some "eating money." Slocum sent $75.00 to Levine by Officer Odis Doyle. Slocum testified he agreed it was a good idea for Levine to leave town for his safety and security. Slocum testified he never knew where Levine lived and did not know his present whereabouts.

Odis Doyle, San Antonio police sergeant, testified he was working on July 10, 1972, and that he had known Levine some months prior thereto, and that Levine was assisting in making narcotics cases for him for a certain period of time. He last saw him in the early part of September, 1972, when he delivered to him at the Globe Store on Santa Rosa Street the $75.00 he had gotten from Slocum, and this was before the warrants were issued on September 7, 1972, for a narcotics roundup. He stated he knew where Levine lived before that time,[3] but not at the present time and that he had no control over whether Levine left town or not.

Mary Helen Napoles of 3118 West Commerce Street testified that Levine lived at her house for awhile and she was his girlfriend, but they broke up in July, 1972, and she had not seen him since and did not know where he was.

Marie Levine of 518 San Joaquin testified she was his sister-in-law, but she had not seen him for five or six years.

Assistant District Attorney Bill White testified that he and his office had tried to

2. Appellant's trial counsel testified that the original indictment related only to the primary offense and that a subsequent indictment returned on March 8, 1973, included allegations as to the prior convictions. The date of the original indictment does not appear in the record.

3. It does not appear that Doyle was asked at what address Levine lived before September 7, 1972.

learn Levine's whereabouts and had checked the national computer system, the F.B.I. and penitentiary records, all without success.

Deputy Sheriff Antonio Gonzales attempted to serve a subpoena on Levine requested by the appellant some 16 days prior to trial and found the address listed was not a current address. Deputy Sheriff William Schultz testified that he learned that Levine had not been at the address listed on the subpoena for over three years. He stated the sheriff's office had done everything they could to locate Levine but had been unsuccessful.

In addition to the above witnesses, appellant, in support of his pre-trial motions, called a private investigator that he had employed. The investigator testified he had spent 55 hours from January to the time of hearing on May 22, 1975, trying to locate Levine, without success.

The appellant Sigard, testifying for the limited purpose of the hearing, stated he first became acquainted with Levine at the San Antonio State Hospital where they were both being treated for narcotic addiction, but knew him as Contrares. He related that he had seen Levine and Chevera near a restaurant on July 10, 1972, and that Levine had introduced Chevera as a cousin. Both told him they were "strung out" and were looking for narcotics and asked the appellant to accompany them because "Little Joe," whom they were looking for might not recognize Levine but would recognize the appellant. They drove to a location and Chevera gave Levine $30.00, and the appellant and Levine went to an upstairs apartment where Levine talked to someone through a door and obtained two balloons of apparent heroin for $30.00. Appellant related they returned to the car and that the other two took him back to the restaurant; that he did not receive any of the heroin. He stated he believed that Levine would testify to substantially the same facts and show that he did not sell heroin to Chevera. He testified that after his arrest he heard others arrested talking about a "Levine" as having made the cases against them, but at the time he didn't know Contrares was Levine. He then detailed his unsuccessful efforts to find Levine.

After the hearing, the court overruled all pre-trial motions and ordered the appellant to trial. The appellant pled "not guilty." The State also offered the testimony of Chevera, Doyle and that of a chemist. The State also offered proof of the prior convictions alleged. The appellant did not testify.

We held in *James v. State,* 493 S.W.2d 201 (Tex.Cr.App.1973), that the identity of an informer must be disclosed when he was present at the time of the occurrence of the alleged crime. See also *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). There can be no question in the instant case but that the identity of Levine was revealed or was otherwise well known to the appellant.

Further, in regard to appellant's contention that he was denied the compulsory process of witnesses, we observed that the Sixth Amendment[4] does not require that the State or government be successful in trying to subpoena witnesses. All that is required is that the process issue and due diligence be exercised in a good faith attempt to secure service of the process. *United Sates v. Bolden,* 461 F.2d 998 (8th Cir. 1972); *Maguire v. United States,* 396 F.2d 327 (9th Cir. 1968).

While a guarantee of compulsory process for obtaining a witness means that the accused is entitled, as a matter of right, to invoke the aid of the law to compel the personal attendance and actual presence of a witness at his trial when their presence is obtainable, nevertheless, it does not amount to guarantee of actual attendance of such witness, and the fact that despite all efforts being made the witness is still absent at the time of the trial, this absence does not show a denial of any constitutional right of the defendant. 97 C.J.S. Witnesses § 10, and cases cited thereunder.

4.  See also Article I, Sec. 10, State Constitution.

The Fifth Circuit Court of Appeals announced the rule in *United States v. Gentile,* 495 F.2d 626, 634 (5th Cir. 1974), that "(w)hile the government is not required to actually produce the informer at trial, once the identity is revealed, we think the better practice is to require disclosure of the last known residence of the informer or to provide reasonable assistance in locating him." See also *United States v. Ortega,* 471 F.2d 1350, 1358 (2nd Cir. 1972).

The Tenth Circuit Court of Appeals enunciated a similar guideline in *United States v. Hayes,* 477 F.2d 868 (10th Cir. 1973), that "(t)he government is not the guarantor of the appearance of its informant at trial, but is required to accord reasonable cooperation in securing his appearance where a timely request is made and his testimony might substantiate a claim of the defense."

■ These decisions are of benefit in the present situation. The apparent conclusion to be drawn from the State's witnesses seems to be that Sgt. Doyle was the only one who ever knew where Levine lived and that was over two and one-half years prior to the actual trial. Neither Sgt. Doyle, Chevera nor Slocum was aware of appellant's location at the time of trial. Deputy Sheriffs Schultz and Gonzales did exercise a good faith effort and due diligence to serve the subpoena requested by the appellant at three of the last known addresses of appellant. We further observe that Assistant District Attorney White attempted to locate Levine through the national computer system and the penitentiary systems. He also instructed one of his investigators to seek Levine through his old neighborhood. Appellant's diligent search and subsequent failure to locate Levine lends credence to the State's good faith efforts. The efforts of the State to locate Levine must be viewed as reasonable assistance and cooperation in attempting to locate him.

■ Further, we cannot reach the conclusion that Lt. Slocum had the $75.00 delivered to Levine two and one-half years prior to the actual trial of the case in order to conceal evidence and deprive the appellant of the right of compulsory process of witnesses. The appellant had not even been arrested, and no indictment had ever been returned at the time. The record reflects that Slocum's reasons were dictated by his concern for Levine's personal safety and security which would make it a "good idea" for Levine to leave town prior to the narcotics roundup. As stated in the concurring opinion on the State's motion for rehearing in *White*:

"... It is certainly common knowledge that lives of informers in narcotic cases are in constant danger. The conversation appears to have taken place shortly after Leveine's activities as an informer had been completed. Upon Leveine's suggestion that he 'needed some money to eat' Slocum sent him $75.00 by one of his officers. The amount involved was not sufficient to allow him to travel any great distance or to keep him in food for long."

Slocum's action cannot be seen as a calculated attempt to deprive this appellant of compulsory process because of Levine's unavailability two and one-half years later. Indeed, Levine's appearance as a witness at future trials would seem to be more assured and likely if he sought safety out of town at the time than if he remained in town at the mercy of alleged narcotics pushers who might be released on bond.

■ Further, for the same reasons, we cannot conclude that the appellant was deprived of due process or that the court erred in overruling the motion for the State to produce Levine, his motions to abate or dismiss the prosecution, the motion to suppress evidence or the third motion for continuance based on the absence of Levine, as were the earlier motions. We are here confronted with a case that long pended on the docket of the court while both sides made a diligent effort to locate Levine without success and there was no showing that if the case was continued there would be any chance of locating Levine, and further, neither the State nor the appellant knew for sure what Levine's testimony would be. Under the circumstances, the trial court cannot be faulted for proceeding with the

trial almost three years after the alleged offense and over two years after return of the last indictment.

Lastly, appellant complains of the trial court's overruling his motion for new trial and the pro se supplement to the motion. It is observed such motion and supplement were based on the same grounds as discussed above, and the overruling of such motion and supplement presents no error.

The judgment is affirmed.

ODOM, Judge (dissenting).

I dissent to the affirmance of this case, and if I could determine what rule of law is being applied by the majority, I would probably dissent to that hidden reasoning as well.

The first half of the majority opinion sets out the facts. Then, after observing that the disclosure of the identity of the informer constituted compliance with *James v. State*, 493 S.W.2d 201 (Tex.Cr.App.), the majority opinion briefly reviews statements from several cases out of several United States Courts of Appeals, which, of course, are not controlling authority in this jurisdiction. It is then proclaimed: "These decisions are of benefit in the present situation." How they are "of benefit" is not explained. Guidelines might well benefit us and the rest of the bench and bar of Texas, but I see no guidelines established in the majority opinion.

Instead of guidelines, the majority opinion simply recites evidence that months after the disappearance of the witness the State made considerable effort to relocate him, and that the initial State action was inconsequential because seventy-five dollars "was not sufficient to travel any great distance nor keep him [the missing witness] in food for long."

It is true that the State made diligent effort to find the witness, and that good faith effort is to be commended. But the ineffectiveness of that effort only serves to demonstrate all the more dramatically how successful the disappearance was in the first place. It is useless to close the barn door after the horses are gone.

The majority express concern over the safety of Levine, but should not the constitutional rights of the accused also receive our concern? As was stated in *White v. State*, 517 S.W.2d 543 at 548 (Tex.Cr.App.) (majority opinion on original submission), "Other means are available for the protection of a material witness than sending him out of town and rendering him totally unavailable to either party." The majority state, "Levine's appearance as a witness at future trials would seem to be more assured and likely if he sought safety out of town at the time than if he remained in town at the mercy of alleged narcotics pushers who might be released on bond." It need only be observed that if it was the State's purpose to guarantee Levine's safety for appearance at appellant's trial, the State's plan utterly failed here, regardless of the likelihood asserted by the majority. Furthermore, the State has not asserted any such plan for Levine, nor explained its failure. Also, if Levine had remained in town, the State would not have been required to leave him at anyone's "mercy", but surely could have given him protection if needed. In sum, the two alternatives posed by the majority are not the only two that were available, and the one given the nod of approval by the majority was not even carried out by the State in this case.

The majority's apparent reliance, in reaching its decision, on the amount of the money given the missing witness by the State surprises me. Instead of asking whether the State's action was improper, the majority asks how much money was paid. Is the Court today holding that State action that successfully contributes to the disappearance of a material defense witness presents reversible error only if the State paid the entire bill? How much money paid to the witness would have changed the disposition of this case?

The case should not turn on how much money was paid but, instead, on whether the action was successful and, if so, whether the State participated at all. The appropriate analysis for disposition of the issue is

that set out in *White v. State,* supra, in the majority opinion on original submission. When a defendant asserts denial of compulsory process on the basis of State action rendering the witness unavailable, the relevant inquiries are (1) materiality of the witness, (2) timely pursuit by the defense, (3) knowledge of the materiality of the witness at the time of the State's action, and (4) improper action attributable to the State contributing to the witness' unavailability. I am convinced in this case as I was in *White v. State,* supra, that reversible error has been shown.

For the foregoing reasons, I dissent.

ROBERTS, J., joins in this dissent.