[No. 9976–1–I. Division One. November 21, 1983.]

THE STATE OF WASHINGTON, *Plaintiff,* v. THEODORE RINALDO, *Respondent,* THE EVERETT HERALD, *Petitioner.*

---

[5]See footnote 3.

*Perkins, Coie, Stone, Olsen & Williams* and *David J. Burman,* for petitioner.

*Mark D. Mestel,* for respondent.

ANDERSEN, C.J.—

FACTS OF CASE

This case comes before us on discretionary review of a pretrial discovery order requiring The Herald (formerly The Everett Herald) to produce certain of its files for an in camera inspection by the trial court. The issue arose during the course of pretrial discovery by Theodore Rinaldo with respect to criminal proceedings pending against him.

During the spring and summer of 1979, Gary Larson, a reporter for The Herald, authored a series of six articles concerning alleged cult activities at Eden Farms, a 60- to 80-acre farm operated by Rinaldo. In order to obtain information for the articles, Larson pledged to keep his sources confidential. Later that summer, the Snohomish County Prosecuting Attorney charged Rinaldo with statutory rape, indecent liberties, assault, coercion and intimidating a witness. He was tried and found guilty of some of these offenses by a jury. Approximately a year later, several witnesses

who had testified on behalf of Rinaldo contacted the county sheriff's office and said that they had committed perjury at the trial because of threats by Rinaldo. As a result of these recantations, Rinaldo was charged with perjury, intimidating witnesses, tampering with witnesses and statutory rape.

With respect to these new charges, counsel for Rinaldo filed a motion for a subpoena duces tecum directed to The Herald to disclose to the defense all written or recorded material in its possession compiled after January 1, 1978 which related to Rinaldo, Eden Farms, Ellogos (a nonprofit corporation operated by Rinaldo and the part owner of Eden Farms) and 38 past or current members of those two organizations. In the alternative, the motion asked that The Herald be required to first deliver such material to the court for an in camera inspection.

The Herald moved to quash the subpoena duces tecum on the ground that the information was privileged and not subject to disclosure. The subpoena was subsequently amended to require The Herald to produce any information in its possession potentially favorable to Rinaldo on the issue of guilt or mitigation of degree and all written or recorded statements in The Herald's files given by any of the 21 persons listed by the State as witnesses to be called in Rinaldo's forthcoming trial.

Counsel for Rinaldo argued that there was no privilege, either absolute or qualified, afforded to news gatherers as far as revealing confidential sources in the context of criminal proceedings. He urged the trial court to review the material in camera in order to decide whether production should be required by the court.

The trial court held that the newspaper had a qualified privilege of nondisclosure which would have to be balanced by the court against Rinaldo's constitutional right to a fair trial and ordered that the material be produced for an in camera review by the court. On petition by The Herald, we granted discretionary review. We then later stayed proceedings in this court pending the Supreme Court's anticipated decision in *Senear v. Daily Journal–American,* 97

Wn.2d 148, 641 P.2d 1180 (1982), a decision which has now been filed.

One ultimate issue is presented in the case before us.

## ISSUE

Did the Superior Court of the State of Washington for Snohomish County err in ordering The Herald and its reporter to reveal their confidential news sources, and to turn over the confidential information obtained from such sources for review by the court at an in camera hearing—and at which hearing the court would determine what part of such information, if any, would be provided to the defendant in this criminal prosecution?

## DECISION

CONCLUSION. In this criminal case, under article 1, section 5 of the Constitution of the State of Washington, The Herald and its reporter had an absolute privilege of nondisclosure of confidences and confidential news sources, and since there was no abuse of that privilege the trial court erred in entering its discovery order.

The United States Supreme Court has considered the question of a news reporter's privilege against disclosure in one case, as has the Supreme Court of this state in another. In order to put the holding in this case and the views expressed herein into perspective, those two decisions will first be referred to.

The leading case nationally on this subject is *Branzburg v. Hayes,* 408 U.S. 665, 33 L. Ed. 2d 626, 92 S. Ct. 2646 (1972) decided by the United States Supreme Court. There, in an opinion expressing the views of five members of the Court, it was held that the first amendment to the United States Constitution[1] does not give reporters a privilege against appearing before a federal grand jury and answering questions about the identity of news sources or infor-

---

[1] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." U.S. Const. amend. 1.

mation received in confidence. Two things about that decision are of particular legal significance in the case at bench. One is that in *Branzburg,* The New York Times (whose reporting functions were there in issue) did not seek a declaration of absolute privilege (as The Herald does in this case). The other is that the majority specifically observed:

> *It goes without saying, of course, that we are powerless to bar state courts from responding in their own way and construing their own constitutions so as to recognize a newsman's privilege, either qualified or absolute.*

(Italics ours.) *Branzburg,* 408 U.S. at 706.

The leading case in this state is now the State Supreme Court's recent holding in *Senear,* a civil case,[2] in which the majority held that a reporter has a *common law* privilege, but that the privilege is only a "qualified" one. As the majority also made clear in that case, "we confine the qualified privilege to civil cases. We do not here decide whether it applies in criminal prosecutions." *Senear,* at 151. The State Supreme Court in *Senear,* as well as a different panel of this court when *Senear* was earlier before us,[3] stated that it would not find that the first amendment to the United States Constitution afforded a reporter an absolute privilege of nondisclosure of confidential news sources in either criminal or civil actions. *Senear,* at 151.

The right of the courts of this state to recognize an absolute reporter's privilege of nondisclosure of confidential news sources and information in criminal cases under our state constitution (the issue before us in this case) has thus been specifically left open to us by the United States Supreme Court in *Branzburg,* and has not as yet been addressed by any appellate court of this state.

---

[2]*See also Clampitt v. Thurston Cy.,* 98 Wn.2d 638, 658 P.2d 641 (1983), which follows the holding in *Senear v. Daily Journal–American,* 97 Wn.2d 148, 641 P.2d 1180 (1982). *Clampitt,* like *Senear,* is also a civil case and also applies the reporter's "qualified" common law privilege fashioned in *Senear.*

[3]*Senear v. Daily Journal–American,* 27 Wn. App. 454, 459–60, 618 P.2d 536 (1980).

To then turn to our state constitution's free speech and press clause.[4] First of all, in interpreting that clause "we must credit the people with knowing their own purposes and with knowing how to express them."[5] Furthermore, "in determining the meaning of a state constitution it is also proper to consider the fact that the convention considered a particular proposed provision and then determined to reject and omit it. Comparably, words left out of the final version because voted down in the constitutional convention are to be noticed as giving meaning to the intent of the framers."[6] (Footnotes omitted.)

■ Unfortunately, only a summary abstract of motions and votes of the constitutional convention which adopted our state constitution has survived, and the verbatim shorthand report made of the convention proceedings was destroyed without ever being transcribed.[7] However, it is the law of this state that contemporary newspaper accounts may be consulted in construing a constitutional provision.[8] Fortunately, such accounts have been documented in the course of historical research and have recently been made available for our use.[9]

As this historical research now makes clear, three separate freedom of speech and press clauses were considered by the Washington State Constitutional Convention of 1889

---

[4]"Freedom of speech. Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." Const. art. 1, § 5.

[5]*State ex rel. Blakeslee v. Clausen,* 85 Wash. 260, 270, 148 P. 28 (1915).

[6]16 Am. Jur. 2d *Constitutional Law* § 129, at 498 (1979).

[7]*Journal of the Washington State Constitutional Convention, 1889,* at vi, vii (B. Rosenow ed. 1962).

[8]*Yelle v. Bishop,* 55 Wn.2d 286, 291–92, 347 P.2d 1081 (1959); *In re Borchert,* 57 Wn.2d 719, 727, 359 P.2d 789 (1961) (Weaver, J., concurring). *See Public Hosp. Dist. 1 v. State,* 24 Wn. App. 363, 368, 601 P.2d 958 (1979).

[9]Washington/Northwest Room, Washington State Library, Olympia, Washington.

which assembled in Olympia, Washington, and wrote our state constitution. The evolution of that clause is both informative and interesting.

*The first version of the free speech and press clause considered by our state's constitutional convention* was that contained in the so–called Hill Proposed Constitution for the State of Washington. That proposal was commissioned by The Morning Oregonian and was drafted by W. Lair Hill, a lawyer and former editor of that Portland, Oregon, newspaper. At the time of the constitutional convention, Mr. Hill lived in Seattle. The Hill Proposed Constitution for the State of Washington was printed in The Morning Oregonian on July 4, 1889, the opening day of the convention, and a copy was placed on the desk of each delegate. That the Hill proposal was given serious consideration by the delegates throughout the convention is evinced by the fact that some 51 of its provisions were subsequently adopted without change. As drafted by W. Lair Hill, the proposed free speech and press clause was contained in the Bill of Rights section of his proposed constitution as article 1, section 5 thereof. It read as follows:

> *No law shall be passed* restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever, but every person shall be responsible for the abuse of this right.

(Italics ours.)[10]

*The second version of the clause* was that submitted to the convention by delegate Allen Weir (later elected Secretary of State of the State of Washington). On July 11, 1889, he proposed a somewhat different Bill of Rights, and article 1, section 4 of the Weir proposal read as follows:

> *The right of free speech written, printed or spoken,* when not infringing the rights of others, *shall forever remain inviolate,* and shall be secured to every citizen.

(Italics ours.) This version was referred to the convention's

---

[10]The Morning Oregonian, July 4, 1889; J. Fitts, *Washington Constitutional Convention of 1889,* at 21–22 (1951) (a master's thesis); *Journal of the Washington State Constitutional Convention, 1889,* at v–vii (B. Rosenow ed. 1962).

standing Committee on Preamble and Declaration of Rights.[11]

*The third and final version of the clause* was that ultimately recommended by the Committee on Preamble and Declaration of Rights, as article 1, section 5 of that committee's proposed Bill of Rights. The committee reported it out to the floor of the convention on July 25, 1889. It read as follows:

*Every person may freely speak, write and publish on all subjects,* being responsible for the abuse of that right.

(Italics ours.) It is this third version of the free speech and press clause which was ultimately adopted by the convention, ratified by the people and has ever since been an integral part of this State's Bill of Rights and Constitution. Const. art. 1, § 5.[12]

Thus from a historical standpoint, it can readily be seen that the free speech and press clause of our constitution became progressively more liberal during the course of convention consideration. The first version considered by the convention (the Hill proposal) was a prohibition against the enactment of laws that would abridge freedom of speech and press. The second version (the Weir proposal) was the declaration of a general constitutional policy. The third and final version (the proposal written by the convention's standing Committee on Preamble and Declaration of Rights) went all the way, and was an affirmative grant of a guaranteed right to every person. The free speech and press clause in its final form is thus not a mere guide to the formulation of state policy, but is a command, the breach of which cannot be tolerated.

Those hardy frontier lawyers, newspaper people and their colleagues at the 1889 constitutional convention said it as clearly as they possibly could—the right to free speech

---

[11]*Journal of the Washington State Constitutional Convention, 1889,* at 50–53 (B. Rosenow ed. 1962).

[12]*Journal of the Washington State Constitutional Convention, 1889,* at 154, 496–97 (B. Rosenow ed. 1962). See footnote 4.

and press in the State of Washington is a privilege guaranteed to all, and so long as it is not abused is absolute. Then to insure that this right would not be tampered with by future legislatures or courts, they wrote the privilege into our state constitution.

Unlike the United States Supreme Court's interpretation of the First Amendment (see footnote 1) in *Branzburg v. Hayes,* 408 U.S. 665, 33 L. Ed. 2d 626, 92 S. Ct. 2646 (1972), as requiring a "balancing" and "weighing" of the respective rights of the parties, our state constitution in article 1, section 5 speaks in absolutes when it unequivocally declares that *"[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right."* (Italics ours.) It is important to note that here, unlike *Senear v. Daily Journal–American,* 97 Wn.2d 148, 641 P.2d 1180 (1982) and *Clampitt v. Thurston Cy.,* 98 Wn.2d 638, 658 P.2d 641 (1983), where claims were made to the contrary, there is not so much as a suggestion that The Herald or its reporter, Gary Larson, abused their press freedoms in any way. Simply stated, there was a story to get and the reporter went out and got it.

The press freedoms contemplated by the words "press" in the federal constitution (see footnote 1), "publish" in the state constitution (see footnote 4) and "gather news" in connection with both, have historically and in law always been considered as part and parcel of the same thing;[13] and

---

[13] The liberty of the press is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets. These indeed have been historic weapons in the defense of liberty, as the pamphlets of Thomas Paine and others in our own history abundantly attest. The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion. What we have had recent occasion to say with respect to the vital importance of protecting this essential liberty from every sort of infringement need not be repeated.

The ordinance cannot be saved because it relates to distribution and not to publication. "Liberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value."

(Footnotes and citations omitted.) *Lovell v. Griffin,* 303 U.S. 444, 452, 82 L. Ed. 949, 58 S. Ct. 666 (1938).

are so considered here.

 There is an obvious and substantial difference between the wording of the federal and state constitutions with respect to protections afforded the press. Since the seven members of this state's constitutional convention committee which wrote the final version of the free speech and press clause included two lawyers, two newspaper people, a former clerk of the Supreme Court, a former mayor of Vancouver and a territorial legislator, and since the 75 delegates to the Washington State Constitutional Convention included in their number a total of 27 lawyers and 4 newspaper reporters or publishers,[14] we can safely assume two things. First, the delegates were at least as familiar with the First Amendment of the Bill of Rights as we are today. Second, the difference between the First Amendment and article 1, section 5 of our state constitution, which these delegates drafted and adopted, was earnestly intended. See footnotes 1 and 4. It follows that the courts of this state have the power to interpret our state constitution as being more protective of press freedoms than the parallel provision of the United States Constitution.[15]

 With regard to the "weighing" and "balancing" of the rights of the news media against other rights in deter-

---

The following excerpt from the dissent in *Branzburg* uses language with which the majority and the other opinions in that case from their tenor obviously do not disagree:

In keeping with this tradition, we have held that the right to publish is central to the First Amendment and basic to the existence of constitutional democracy. . . .

A corollary of the right to publish must be the right to gather news. The full flow of information to the public protected by the free–press guarantee would be severely curtailed if no protection whatever were afforded to the process by which news is assembled and disseminated.

*Branzburg,* 408 U.S. at 727 (Stewart, J., dissenting). *See also Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 65 L. Ed. 2d 973, 100 S. Ct. 2814 (1980).

[14]*Journal of the Washington State Constitutional Convention, 1889,* at 157, 465–90 (B. Rosenow ed. 1962).

[15]*See State v. Simpson,* 95 Wn.2d 170, 177–78, 622 P.2d 1199 (1980).

mining whether disclosure will be required, a methodology which Rinaldo argues should be followed in this case, it need only be said that all necessary "weighing" and "balancing" was done in 1889 when this State's constitutional convention adopted our constitution and the people thereafter ratified it.

The record in this case being devoid of any showing of abuse by The Herald or its reporter of the press freedoms accorded them, they have an absolute constitutional privilege under article 1, section 5 of the Washington State Constitution against disclosing any confidences or confidential news sources.

For the foregoing reasons, this view of the meaning of our state constitution's free speech and press clause is sound based on the plain language of the clause itself, as well as on the basis of historical interpretation. This view also comports with reason and sound public policy for the following additional reasons.

A news reporter is no better than his or her sources of information. It seems to be conceded in all quarters, and is not denied here, that in order to gather news it is often necessary for a reporter to agree not to identify the source of information published or to publish only a part of the facts obtained. It is hard to perceive anything that would be more invidiously destructive of a reporter's ability to gather and report the news (particularly in an investigative reporting context as here), than for the reporter's potential informants to know that despite a sincere pledge of confidentiality the reporter may still be forced by a court to divulge the informant's statements and identity to the person under investigation.

It should be fairly obvious that without some meaningful assurance of complete confidentiality, only a very naive person would be apt to come to the news media with information which some potentially dangerous or powerful person wants to keep concealed.[16]

---

[16]It should be observed parenthetically that the situation involved in an infor-

The case before us is a prime example of this. The only practical way in which the witnesses' statements to The Herald which are sought by the defendant could be used by the defendant would be for him to ultimately obtain the complete statements, including names and addresses of informants. The defendant in this case already stands convicted of serious crimes. The record of the trial resulting in those convictions, which was previously before this court on appeal, is replete with evidence concerning his exploitation of young girls through means of intimidation.[17] He now stands additionally charged with intimidating witnesses, tampering with witnesses, perjury and yet more sex offenses. Against this factual backdrop, it would be a denial of reality to believe that the reporter's sources, who insisted on a pledge of confidentiality before they would talk to him, would have given the reporter any information had they known he could not provide them the confidentiality promised.

It follows, in turn, that the public would have been deprived of what appears to be a significant and perceptive investigative journalism series on political and other events of public interest in Snohomish County.

The reason it is absolutely essential for a reporter to have a privilege against disclosure of confidential sources and information in a case of this kind is not because of the rights of the press as such, but because of the public interest—the right of the people to know, which is a predicate to

mant giving information to the news media in a criminal case is unlike that involved in an informant giving such information to the police. There are at least three major differences between these two situations: (1) the police informant's information is given to the State, which is one of the parties to the litigation; (2) even if the police informant's identity is ordered disclosed by a court, the informant may be afforded protection with the full power of the State behind it; and (3) the police informant's privilege against disclosure is not founded in our state constitution as is the reporter's privilege, as here perceived.

[17]*State v. Rinaldo*, 29 Wn. App. 1004, *review denied*, 96 Wn.2d 1004 (1981). Pursuant to RCW 2.06.040, the opinion of the Court of Appeals affirming the defendant's conviction was ordered filed for record but not printed in the Washington Appellate Reports.

the effective functioning of the Republic. This was eloquently expressed over a century ago by one of our founding fathers, James Madison:

A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives.

9 *Writings of James Madison* 103 (G. Hunt ed. 1910) (to W. T. Barry, Aug. 4, 1822).

In more recent times, Justice William O. Douglas in arguing (unsuccessfully) for an absolute reporter's privilege under the First Amendment, expressed it this way in *Branzburg*:

The press has a preferred position in our constitutional scheme, not to enable it to make money, not to set newsmen apart as a favored class, but to bring fulfillment to the public's right to know.

*Branzburg*, 408 U.S. at 721 (Douglas, J., dissenting). And further:

The function of the press is to explore and investigate events, inform the people what is going on, and to expose the harmful as well as the good influences at work. There is no higher function performed under our constitutional regime.

*Branzburg*, 408 U.S. at 722 (Douglas, J., dissenting).

The framers of this state's constitution doubtless had these principles firmly in mind when they adopted article 1, section 5 of the Washington State Constitution.

The defendant's right to a fair trial is, of course, a right guaranteed by both the federal and state constitutions. U.S. Const. amend. 6; Const. art. 1, § 22. The defendant's right thereunder to compel testimony is not absolute, however. A defendant's constitutional right to compel testimony does not override testimonial privileges such as the husband–wife, priest–penitent, self–incrimination, attorney–client and other such privileges. There is no justification for holding, as Rinaldo seems to suggest, that a defendant's right to

compel testimony should somehow be deemed to override a testimonial privilege because it is a reporter's testimonial privilege that is involved. *See Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 561, 49 L. Ed. 2d 683, 96 S. Ct. 2791 (1976). That is precisely what the result in this case would be if we presumed to "weigh" and "balance" the reporter's privilege against the defendant's right to compel testimony. A privilege is a privilege. If the trial court cannot review matters coming within the foregoing listed category of privileges in camera, as it ordinarily cannot, then it should not be able to do so in matters relating to a reporter's privilege, particularly since in this state the latter is a constitutional privilege.

Considering the repeated confrontations on the disclosure issue between the news media and the courts since *Branzburg,* the question also arises as to just how effective disclosure orders really are. The available empirical data strongly suggests that at best their effect is minimal. For example, it has been reported that none of the three reporters involved in *Branzburg* ever appeared before a grand jury after that decision and that two of them were not even asked to appear again. As a consequence of the highly questionable efficacy of such orders and their proven difficulty of enforcement, disclosure orders directed to the news media in criminal cases would seem to be little more than judicially fashioned Volstead acts. The only thing disclosure orders have unquestionably demonstrated their capacity to do is to pit the news media against the courts, and vice versa, while the case against the defendant ages.

Providing for the review of news media files at an in camera hearing, as the trial court ordered here, is not a solution to the problem at all. Such a loss of confidentiality, even to the eyes of a judge alone, by itself impinges on constitutionally guaranteed press freedoms. News media files are private files, and when they are privileged an in camera inspection by a judge necessarily destroys that privileged status in at least some part. This is not to mention, of course, that the judge who reviews the press files

can summarily hand them over in whole or in part to a defendant. Whether the judge does or does not turn confidential files over to a defendant, the privilege against non-disclosure has been partially destroyed since the reporter's solemn pledge of confidentiality has been violated and the reporter's news gathering ability damaged thereby.

Finally, "[a]n uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all." *Upjohn Co. v. United States,* 449 U.S. 383, 393, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981). The reporter and the reporter's source should both be able to predict with some degree of certainty whether confidential information furnished to the reporter can be protected, and if it cannot be protected, then as a practical matter the privilege is not really a privilege at all.

This being a case of first impression, a footnote is appended employing the socratic method whereby the four principal questions which immediately come to mind about the viability of a reporter's absolute privilege of nondisclosure of confidential information in a criminal case are set out along with what, based on the foregoing analysis, is considered the logical answer to each.[18]

---

[18]*Question 1.* Could not a case arise where a reporter's privilege of nondisclosure of confidential information and informants might be used to cover up the reporter's own criminal conduct?

*Answer.* No. Article 1, section 5 of the Washington State Constitution relating to press freedoms requires responsibility for "the abuse of that right." Upon crossing the pale to become a participant in a criminal act, a reporter would waive the constitutional protection afforded reporters and stand in the same position as any other violator of the criminal code. For example, a reporter has no right to steal information or to use blackmail to obtain it. No one is above the law.

*Question 2.* Since this State has never enacted a news media shield law, does that not indicate that no reporter's privilege is intended?

*Answer.* No. So far as can be ascertained, there has been no strong concerted effort by the news media directed at either the executive or legislative branches of this State's government to get a shield law enacted. In fact, the contrary is indicated; the portions of the news media interested in such matters apparently prefer to rest their case on constitutional rather than statutory grounds. Logically this is so, since statutory news media shield laws, however broad, can be set aside by courts which are so inclined. *See, e.g., In re Farber,* 78 N.J. 259, 394 A.2d 330,

The trial court's order compelling disclosure of the files of The Herald and its reporter is hereby quashed and the

---

*cert. denied sub nom. New York Times Co. v. New Jersey*, 439 U.S. 997, 58 L. Ed. 2d 670, 99 S. Ct. 598 (1978). Since an absolute constitutional privilege exists, as here perceived, then a statutory privilege would be redundant in any event.

*Question 3.* Does not an absolute reporter's privilege of this kind derogate from the constitutional rights every defendant is entitled to, including the right to compulsory process guaranteed by the sixth amendment to the United States Constitution and article 1, section 22 of the Washington State Constitution?

*Answer.* No. In the first place, such a privilege is obviously not one sided. It protects the news media against disclosure of confidential informants from incursions by either side, prosecutor or defendant. The time when discovery was denied to defendants in criminal cases in this state is long past. Both sides are now afforded liberal legal discovery rights. *See* CrR 4.5–4.8. Defendants are now routinely furnished with a complete copy of the entire police investigative file in a case, including statements and names of witnesses, as was done in the present case. Defendants can also, when needed, obtain the assistance of professional investigators and expert witnesses of their own as well as take depositions under oath of witnesses and suspected witnesses alike, to mention just a few of the many sources of available assistance. This is not to mention that if a person is indigent the foregoing can be furnished at public expense along with an attorney or attorneys to represent the defendant. In this state a defendant on a proper showing may even obtain copies of testimony and evidence presented before a state grand jury or special inquiry judge. RCW 10.27.090(5).

*Question 4.* But what happens if a case comes along where a defendant satisfactorily proves that "but for" the defendant getting access to information furnished to a reporter by a confidential informant, or the informant's name, an injustice will occur?

*Answer.* It has been suggested by at least one legal commentator that if that should occur, then the prosecution should be dismissed. If it came to that, however, no good reason appears why such a situation should be treated any differently than any other case where a defense witness is unavailable because a witness cannot be located or claims a privilege against testifying. *See, e.g., State v. Burleson*, 18 Wn. App. 233, 239–40, 566 P.2d 1277 (1977); *Maguire v. United States*, 396 F.2d 327, 330 (9th Cir. 1968), *cert. denied*, 393 U.S. 1099, 21 L. Ed. 2d 792, 89 S. Ct. 897 (1969); *Sigard v. State*, 537 S.W.2d 736, 739–40 (Tex. Crim. App. 1976).

It should be emphasized, however, that the problem would probably never arise or need to be dealt with. Most if not all of the reported decisions on the subject have been read and no such case as this question poses has yet been found. It is questionable that such a case will come along—at least in a state with our broad legal discovery rules in criminal cases. It is highly unlikely hard dedicated effort by competent counsel, using necessary assistance and aided by our liberal legal discovery rules, could not duplicate the substance of anything provided to the news media by a confidential informant. The practical problem is that in almost any such case, it is both tempting and easy for counsel to simply dictate an affidavit based on assumptions, liberally laced with "ifs", "maybes", "possiblys" and other speculation, and quite possibly convince a judge to order

case is remanded to the Superior Court for Snohomish County for further proceedings against the defendant, Rinaldo.

DURHAM, J. (concurring)—Chief Judge Andersen has written an exhaustive and highly persuasive opinion based upon public policy and historical grounds. His conclusion that the newspaper should be afforded an absolute privilege against disclosure, however, need not be reached in order to dispose of the case before us. I would hold instead that, because Rinaldo failed to meet the threshold requirements to compel an in camera review, let alone disclosure, the trial court abused its discretion and must be reversed.

In both *Senear v. Daily Journal–American,* 97 Wn.2d

---

the disclosure of information furnished on a confidential basis to the news media. The judge will after all bend over backwards to be fair to the defendant, and be concerned with that one defendant's case, rather than with the broad policy of the law as it affects the entire news media. No one can quarrel with counsel doing anything and everything he or she can ethically do in order to assist a client charged with a crime, but practices such as those just referred to are, as a practical matter, destructive of this State's constitutional press privilege and can well reduce it to little more than words and form without substance. That, in a nutshell, is why public policywise the only privilege which will protect the freedom of the press in confidential informant cases is an absolute privilege based on our state constitution.

At the risk of undue prolixity, it should be added that an instructive case on this point is *McNabb v. United States,* 318 U.S. 332, 87 L. Ed. 819, 63 S. Ct. 608 (1943). There the defendant's conviction was reversed by the United States Supreme Court because the defendant's confession had been obtained in violation of his rights. In support of the policy excluding the use of such evidence, Mr. Justice Frankfurter writing for the majority of the Court cited an example drawn from human experience during the British occupation of India. It is this:

"During the discussions which took place on the Indian Code of Criminal Procedure in 1872 some observations were made on the reasons which occasionally lead native police officers to apply torture to prisoners. An experienced civil officer observed, 'There is a great deal of laziness in it. It is far pleasanter to sit comfortably in the shade rubbing red pepper into a poor devil's eyes than to go about in the sun hunting up evidence.'. . ."

*McNabb v. United States,* 318 U.S. at 344 n.8. So, too, is it easy to seek disclosure orders or issue subpoenas to the news media asking for the names of confidential informants and other confidential information; but that practice, which is unfortunately being seen with increasing frequency, can in its own way be destructive of the very freedoms that we all cherish.

148, 641 P.2d 1180 (1982) and *Clampitt v. Thurston Cy.*, 98 Wn.2d 638, 658 P.2d 641 (1983), the Supreme Court reserved the question of the scope of the constitutional privilege under article 1, section 5, because the journalists were entitled to relief on narrower common law grounds.[19] In these cases, the court established criteria for determining if discovery should be allowed. In *Clampitt,* the court stated:

> The party seeking discovery may defeat the privilege by showing that (1) his or her claim is meritorious; (2) the information sought is critical to that claim; and (3) he or she has made a reasonable effort to obtain the information by other means. *Senear,* at 155.

*Clampitt,* at 642. It also noted that the *Senear* standards should be applied more stringently where, as here, the newspaper is not a party. These standards are consistent with those recently imposed in other jurisdictions. *See State v. Siel,* 122 N.H. 254, 444 A.2d 499, 503 (1982); *State ex rel. Green Bay Newspaper Co. v. Circuit Court, Branch 1, Brown Cy.,* 113 Wis. 2d 411, 335 N.W.2d 367 (1983). These cases not only adopt similar procedures for disclosure, but express the need to limit disclosure to situations in which virtually no other relief can be substituted. The indisputable value of maintaining reporter/informant confidentiality has already been discussed at length in the majority opinion.

Applying *Senear/Clampitt* criteria to this case, it is clear that disclosure was improvidently granted.[20] First, there was insufficient showing that the material sought was criti-

---

[19]*Senear v. Daily Journal–American,* 97 Wn.2d 148, 641 P.2d 1180 (1982) and *Clampitt v. Thurston Cy.,* 98 Wn.2d 638, 658 P.2d 641 (1983) are, of course, civil cases and, as such, not direct precedent. However, I can see no reason why those cases should not apply here. It might be suggested that, in balancing a common law right against the constitutional right of a fair trial, the *Senear/Clampitt* criteria should be weakened in favor of the criminal defendant. I am unaware of authority for such an argument and choose not to create any.

[20]In fairness, it must be added that neither *Senear* nor *Clampitt* were available to the trial court, having been decided recently during the appeal process.

cal or necessary to Rinaldo's claim. The affidavit in support of the motion to disclose was worded in the broadest possibilities. There was no showing of likelihood that The Herald files contained exculpatory material, or that they would be valuable for purposes of impeachment. Indeed, the impeachment value of the claimed material appears to be tenuous, at best, with respect to resolution of Rinaldo's guilt or innocence. The speculative nature of Rinaldo's request for disclosure was insufficient to overcome even a qualified privilege and amounts to nothing more than a fishing expedition.

Second, the substantial requirement that reasonable alternative sources be exhausted was neither met nor adequately explored. Rinaldo's counsel had not even interviewed the prosecution's witnesses to determine if they would deny prior statements, make such statements available, or even be allowed to testify. There was, simply, no showing that the newspaper had unique access to the questioned material.

Under these circumstances, and noting the admonition that "the magnitude of the interests involved requires close appellate supervision of [a trial court's] discretion", *Clampitt*, at 644, I conclude that the showing offered by Rinaldo in support of disclosure was wholly inadequate, that the order for an in camera review should be reversed, and the subpoena quashed.

RINGOLD, J. (dissenting)—I would affirm in accord with the original opinion in State v. Rinaldo filed on March 21, 1983, (Ringold, J., Durham, J., concurring) (unpublished pending motion for reconsideration) which held that Rinaldo made a sufficient showing to justify an in camera review by the trial court.

There is no question that the provisions of our state constitution, article 1, section 5 could be read as more protective of the news media than is the first amendment to the United States Constitution. The members of the State Supreme Court are cognizant of the fact that "state courts

have the power to interpret their state constitutional provisions as more protective of individual rights than the parallel provisions of the United States Constitution." *State v. Simpson,* 95 Wn.2d 170, 177, 622 P.2d 1199 (1980). The Supreme Court was aware of this power when it decided *Senear v. Daily Journal–American,* 97 Wn.2d 148, 641 P.2d 1180 (1982) and *Clampitt v. Thurston Cy.,* 98 Wn.2d 638, 658 P.2d 641 (1983).

The Herald did not claim that it had an absolute privilege under the state or federal constitution in its opening brief, reply brief, or at oral argument. It was not until after Judge Andersen filed a dissenting opinion stating that the news media possess an absolute privilege that The Herald filed a motion for reconsideration claiming an absolute privilege under the Washington State Constitution. Judge Andersen's opinion now elaborates upon the conclusion that the news media possess "an absolute privilege of nondisclosure of confidences and confidential news sources". I disagree with Judge Andersen's opinion because it ignores stare decisis and is contrary to all precedential authority. I am not aware of, nor has Judge Andersen cited, any appellate court in the United States which supports his view.

A brief review of *Senear v. Daily Journal–American,* 27 Wn. App. 454, 459–60, 618 P.2d 536 (1980) is instructive. This court held:

> Courts that have considered the issue have unanimously concluded that the First Amendment affords the newsperson no *absolute* privilege of nondisclosure of confidential news sources—whether it be in the criminal or civil context. . . . The First Amendment does not, of itself, create in newspersons an absolute privilege of nondisclosure of sources.

(Citations omitted.) We then held that a newspaper has a First Amendment qualified privilege in a *civil* case. The opinion established standards to be met before requiring disclosure, and remanded to the trial court for a redetermination of the propriety of disclosure based on the enumerated criteria.

On March 4, 1982, the Supreme Court filed its opinion in *Senear* holding that a qualified common law privilege exists in civil cases protecting a reporter from compulsory disclosure of news sources. The court declined to reach the First Amendment issue, except to note:

> The courts which have considered the issue have unanimously concluded that the First Amendment affords a reporter no *absolute* privilege of nondisclosure of confidential news sources in either a criminal or civil action. *See, e.g., Herbert v. Lando,* 441 U.S. 153, 60 L. Ed. 2d 115, 99 S. Ct. 1635 (1979).

97 Wn.2d at 151–52. The court expressly limited its holding to civil cases and created a doubt as to whether the news media possessed any privilege in a criminal case. The court stated: "We reach the same result as the Court of Appeals although for different reasons. Also, as did the Court of Appeals, we confine the qualified privilege to civil cases. We do not here decide whether it applies in criminal prosecutions." *Senear,* at 151. The Supreme Court then affirmed this court, mandating similar standards and a balancing test for application of the criteria. If the news media does not possess even a qualified constitutional privilege in a civil case it cannot logically be argued—absent a statute—that the news media possess an absolute constitutional privilege in a criminal case. I agree with Judge Durham that we are not confronted with the necessity of deciding a constitutional issue. I would hold that the *Senear* common law news media qualified privilege exists in criminal cases as well as civil.

The sole issue presented to this court is well summarized in The Herald's opening brief:

> This Court should adhere to its own reasoning in the civil area and join those courts that have rejected attempts by criminal defendants to compel news-gatherers to disclose confidential news sources and files absent a clear showing that no alternative is available and that the information is necessary to a fair trial.

Brief of Appellant, at 8.

The Herald did not contend in the case at bench that a

reporter should have a blanket unqualified privilege to refuse to disclose confidential sources and files to a defendant in a criminal matter. Rather, the newspaper argued that the defendant's need for information must be balanced against the need for reporters to keep sources and material gathered confidential, and that a strong threshold showing should be required to justify an in camera hearing in order to keep such hearings from becoming a matter of course in criminal trials. The Herald asserted that Rinaldo failed to make a sufficient showing of necessity to justify an in camera hearing. The question before us is whether Rinaldo met the threshold requirements to compel an in camera review.

Counsel's affidavit in support of the motion stated in part:

2. That the defendant is charged by information with the following offenses: statutory rape (2), indecent liberties, perjury (2 counts); intimidating a witness (4 counts); tampering with a witness (4 counts).

3. That the witnesses with whom it is alleged that the defendant intimidated [sic] have admitted to committing perjury in the past.

4. That the witnesses with whom it is alleged that defendant tampered have admitted to committing perjury in the past.

5. That the witnesses who are the complainants in the sex related charges previously in both sworn and unsworn statements have denied having sexual relations with the defendant.

6. That the State has excused the perjurious statements of various of its witnesses by granting them immunity from prosecution.

7. That affiant believes that the charges against the defendant stem in part from a lengthy investigation into the affairs of defendant, ELLOGOS, and EDEN FARMS by the Everett Herald.

8. (a) That specifically the Everett Herald on July 14, 1979, published a story in which it stated "Fourteen people, including the Oregon couple, signed statements for this newspaper outlining their experiences with Rinaldo and about life at Eden Farms."

(b) On July 17, 1979, it published "This newspaper had completed a four month investigation into Rinaldo

and Eden Farms and had prepared a series of articles about them when Rinaldo was charged and arrested last week."

(c) On July 19, 1979, it published "The newspaper obtained sworn statements from 14 people about their knowledge of Rinaldo and Eden Farms, and talked to at least 11 other former or current associates of the Snohomish businessman."

9. That to the best of affiant's knowledge and belief representatives of the Everett Herald were present when various witnesses were interviewed by law enforcement officials.

10. That according to Deputy Prosecuting Attorneys assigned to this case, the police did not file extensive incident reports of their investigation or interviews of witnesses.

11. That affiant believes that the Everett Herald may contain [sic] information which would impeach the testimony of the State's witnesses as to why they committed perjury and would tend to substantiate the bias of said witnesses against the defendant.

12. That affiant has discussed with Jim Haley, reporter for the Everett Herald and David Utevsky, associate in Foster, Pepper and Riviera, counsel for the Everett Herald, the possibility of obtaining the requested material without a court order and was informed that the Everett Herald would not voluntarily surrender any documents.

13. That to the best of affiant's knowledge and belief there is no less obtrusive manner in which to obtain the requested information.

Counsel for Rinaldo asserted that without knowledge of the contents of the reporter's file it would be virtually impossible to make a showing that the material was otherwise unavailable and favorable to the defense. He urged the trial court to review the material in camera, without defense counsel present, to decide whether the burden requiring production had been met.

The court in *Senear* held that to require disclosure a party must show that: (a) the claim is meritorious; (b) the information sought is necessary or critical to the cause of action; and (c) reasonable efforts were made to acquire the desired information by other means. *Senear,* at 155. In

*Clampitt,* 98 Wn.2d at 642, the court emphasized an additional *Senear* requirement: "'the interest of the reporter in nondisclosure [must be] supported by a need to preserve confidentiality.'"

Whether disclosure will be required in a criminal case will depend on the results of a balancing test similar to that set forth in *Senear,* but which takes into account the defendant's right to a fair trial. This right is rooted in our state and federal constitutions and presents a more compelling interest in favor of disclosure than the needs of a civil litigant. A news reporter's privilege of nondisclosure is "more tenuous in a criminal proceeding than in a civil case," since it "depends upon a balancing of the need of a defendant for a fair trial against the reporter's need for confidentiality." *State v. Sandstrom,* 224 Kan. 573, 575, 576, 581 P.2d 812, 815 (1978). The showing required for release of a reporter's files to a criminal defendant for purposes of discovery will therefore be different from that required by *Senear* in civil cases.

Whether a particular defendant's need for the confidential information or the identity of its source outweighs the reporter's qualified privilege will depend on the facts of each case. *State v. Sandstrom, supra.* The showing required to compel disclosure is well stated in *State v. Siel,* 122 N.H. 254, 259, 444 A.2d 499, 503 (1982):

> a defendant may overcome a press privilege . . . only when he shows: (1) that he has attempted unsuccessfully to obtain the information by all reasonable alternatives; (2) that the information would not be irrelevant to his defense; and (3) that, by a balance of the probabilities, there is a reasonable possibility that the information sought as evidence would affect the verdict in his case.

These factors must be balanced by the trial court against the news media interest in nondisclosure.

The order before us on appeal contemplates an in camera review of the files so that the trial court may intelligently exercise its discretion and balance the factors. The threshold showing necessary to justify an in camera review is of

necessity less than that required to justify disclosure to the defendant, and has been met in this case. The affidavit establishes the likelihood that statements made by witnesses at the upcoming trial are part of The Herald's files. The subpoena as amended encompasses only potentially favorable or impeaching information. Not until the trial court has examined the information can the judge properly balance the competing interests. The actual release of the information to Rinaldo during discovery will, of course, be within the trial court's discretion, *Seattle v. Apodaca,* 18 Wn. App. 802, 572 P.2d 732 (1977), exercised with regard for the factors set out above.

The trial court erred only insofar as it held that the news media privilege is based on the first amendment to the United States Constitution. I would hold that there is a common law privilege applicable to criminal cases and that Rinaldo has made a sufficient showing to justify an in camera review.

Review granted by Supreme Court February 3, 1984.