[Nos. 52665–6, 53565–5. En Banc. June 23, 1988.]

THE STATE OF WASHINGTON, *Respondent,* v. BYRON B. REECE, ET AL, *Appellants.*

THE STATE OF WASHINGTON, *Appellant,* v. J–R DISTRIBUTORS, INC., ET AL, *Respondents.*

*Norm Maleng, Prosecuting Attorney for King County,* and *Michael M. Danko, Deputy,* for appellant State.

*Victor V. Hoff,* for appellants Reece, et al, and respondents J–R Distributors, et al.

*John W. Ladenburg, Prosecuting Attorney for Pierce County,* and *Chris Quinn–Brintnall, Senior Appellate Deputy,* for respondent State.

*Jack R. Burns* and *Rex Armstrong,* amici curiae for defendants.

GOODLOE, J.—These two cases concern the constitutionality of Washington's criminal obscenity statute, RCW 9.68.140, and the definition of "lewd matter" it incorporates from RCW 7.48A.010. In both cases defendants were charged with promoting pornography in violation of RCW 9.68.140. Defendants in State v. Reece were convicted in Pierce County, whereas defendants in State v. J–R Distributors had their charges dismissed in King County. This court then granted direct review to the defendants in Reece and to the State in J–R Distributors. We affirm the defendants' convictions in Reece. We reverse the trial court's ruling in J–R Distributors and remand for proceedings in accordance with this opinion.

## FACTS
### State v. Reece

Defendant J–R Distributors, Inc., owned and operated a retail adult book store in Tacoma. Defendant Byron Reece

was employed as a manager at the store and defendant Terry Styers was employed as a clerk. Reece was paid an annual salary and Styers was paid by the hour.

On July 16, 1985, Pierce County Deputy Sheriff John Solheim purchased a copy of a magazine entitled *Chains and Whips*. The next day, a superior court judge signed a search warrant authorizing the seizure of any additional copies of the magazine, as well as any other literature explicitly depicting violent or destructive sexual acts, such as rape or torture. The officers promptly executed the warrant seizing two copies of *Chains and Whips* and more than 200 other magazines and books. The officers arrested Styers who was working on the premises and Reece who arrived during the search. Reece, Styers, and J–R Distributors were charged with the crime of promoting pornography for the sale, exhibition or display of "lewd matter", namely, two copies of *Chains and Whips*. *See* RCW 9.68.140; 7.48A.010.

The trial court denied defendants' motions to dismiss and the case proceeded to trial. To prove that *Chains and Whips* constituted "lewd matter" within the meaning of the statute, the State relied solely on the magazine. The magazine contains four articles with accompanying pictures. The articles are entitled: "London's Mercenary Masochists", "Foot Fetishism", "How to be a Bastard!", and "The Practice of Bondage". Most of the pictures mainly depict naked or scantily clad women being whipped, strangled, bound in a painful position, or threatened with a knife or other deadly object. In a few of the pictures, the women appear to have welts and blood smears. The magazine contains no depictions of masturbation, excretory functions, closely exposed genitals, or ultimate sex acts.

The trial court instructed the jury that in order to convict the defendants of promoting pornography, it must find that *Chains and Whips* was "lewd matter", that the defendants sold, exhibited or displayed that matter for profit–making purposes, and that they did so with knowledge. The jury found all three defendants guilty as charged.

State v. J–R Distributors, Inc.

Defendants J–R Distributors, Inc., and others were charged with 38 counts of promoting pornography and 55 counts of attempting to promote pornography. *See* RCW 9.68.140; 9A.28.020. These charges resulted from a search and seizure of defendants' Seattle retail outlet and warehouse on October 9, 1986. As described in the prosecutor's certification for determination of probable cause, the magazines seized depict sexually exposed women, and sometimes men, bound and/or gagged in various positions. Clamps, pins, and other items are used in various parts of the body. Whips and rods are often shown, and in some cases women are pictured with welts or marks on their bodies. The texts accompanying the photographs express the view that causing pain and requiring submission will result in heightened sexual pleasure.

Prior to trial, the defendants moved to dismiss on the ground that RCW 9.68.140 violated the free speech clause, article 1, section 5 of the Washington State Constitution. The presiding judge granted the motion and dismissed all charges. The dismissal order, entered February 4, 1987, states that the charges are dismissed on "independent state grounds". The State then sought direct review.

I

FEDERAL OBSCENITY DOCTRINE OVERVIEW

As a preliminary matter, we address defendants' contentions that RCW 9.68.140 and 7.48A.010 violate the first and fourteenth amendments to the United States Constitution. In beginning our analysis with federal law, we do not retreat from our general position that in resolving a constitutional law question we should turn first to the provisions of our own state constitution. *State v. Coe,* 101 Wn.2d 364, 373, 679 P.2d 353 (1984); *see also State v. Gunwall,* 106 Wn.2d 54, 67, 720 P.2d 808 (1986). Nevertheless, we commence here with First Amendment analysis under the belief that an overview of the United States Supreme Court's

position on obscenity will provide helpful background for the state constitutional analysis which follows.

In *Roth v. United States,* 354 U.S. 476, 484–85, 1 L. Ed. 2d 1498, 77 S. Ct. 1304 (1957), the United States Supreme Court held that "obscenity" is not protected under the First Amendment. This holding was based on a historical analysis suggesting that the First Amendment was never intended to protect all expression, but only expression containing some slight social importance. Under the *Roth* definition, as elaborated upon, a work was considered to be obscene when:

> (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value.

*A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General,* 383 U.S. 413, 418, 16 L. Ed. 2d 1, 86 S. Ct. 975 (1966).

The Supreme Court has further modified the *Roth* definition in several respects. First, in *Miller v. California,* 413 U.S. 15, 24, 37 L. Ed. 2d 419, 93 S. Ct. 2607 (1973), the Court abandoned the "utterly without redeeming social value" part of the test and held that the State must instead show that the work, "taken as a whole, lacks serious literary, artistic, political, or scientific value." The *Miller* Court also held that, in determining whether a work appeals to the prurient interest, the trier of fact must apply "contemporary community standards" and further, that state law must specifically define the type of sexual conduct which, if depicted or described in a patently offensive manner, will be obscene. *Miller,* at 24. Later, in *Smith v. United States,* 431 U.S. 291, 301, 52 L. Ed. 2d 324, 97 S. Ct. 1756 (1977), the Court clarified the *Miller* test so as to require application of "contemporary community standards" to the determinations of both prurient interest and patent offensiveness. Finally, in a decision issued earlier this year

the Court held that "contemporary community standards" may *not* be applied to the third prong of the test; rather, the question of literary, artistic, political or scientific value must be determined solely on the basis of what a reasonable person would conclude. *See Pope v. Illinois,* ___ U.S. ___, 95 L. Ed. 2d 439, 444–45, 107 S. Ct. 1918 (1987).

■ Although *Miller* required state law to specify the type of sexual acts which may be obscene, state courts are allowed to construe state statutes so as to cure any facial deficiencies. *See Ward v. Illinois,* 431 U.S. 767, 771, 52 L. Ed. 2d 738, 97 S. Ct. 2085 (1977). This court has twice construed a former obscenity statute, RCW 9.68.010, so as to conform to the federal obscenity test. *See State v. Regan,* 97 Wn.2d 47, 54, 640 P.2d 725 (1982); *State v. J–R Distribs., Inc.,* 82 Wn.2d 584, 512 P.2d 1049 (1973), *cert. denied,* 418 U.S. 949 (1974). The present statute, RCW 9.68.140, may also be so construed.

RCW 9.68.140 provides that a person is guilty of promoting pornography if he or she "for profit–making purposes and with knowledge, sells, exhibits, displays, or produces any lewd matter as defined in RCW 7.48A.010". RCW 7.48A.010 provides, in pertinent part:

(2) "Lewd matter" is synonymous with "obscene matter" and means any matter:

(a) Which the average person, applying contemporary community standards, would find, when considered as a whole, appeals to the prurient interest; and

(b) Which explicitly depicts or describes patently offensive representations or descriptions of:

(i) Ultimate sexual acts, normal or perverted, actual or simulated; or

(ii) Masturbation, fellatio, cunnilingus, bestiality, excretory functions, or lewd exhibition of the genitals or genital area; or

(iii) Violent or destructive sexual acts, including but not limited to human or animal mutilation, dismemberment, rape or torture; and

(c) Which, when considered as a whole, and in the context in which it is used, lacks serious literary, artistic, political, or scientific value.

Since the magazines at issue here are of the "bondage and discipline" type, depicting sexual violence, coercion, and torture, these cases are exclusively governed by subsection (2)(b)(iii).

■ As can be seen, RCW 7.48A.010 generally conforms to the obscenity definition found in *Miller* and *Smith.* Defendants claim error in the fact that the statute does not refer to "contemporary community standards" in the subsection on "patent offensiveness". However, the jury instructions in Reece supplied this missing element and thereby cured any facial deficiency in the statute. *See Ward,* at 771; *Regan,* at 51, 54. Defendants also claim error in the fact that subsection (2)(c) of the statute contains language, not found in *Miller,* that the suspect matter be considered "in the context in which it is used". However, context considerations are permissible in obscenity cases. *See Splawn v. California,* 431 U.S. 595, 598–99, 52 L. Ed. 2d 606, 97 S. Ct. 1987 (1977); *J–R Distribs.,* at 599. Defendants further argue that the statute is defective in light of *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 86 L. Ed. 2d 394, 105 S. Ct. 2794 (1985). *Brockett* held that the definition of "prurient interest" contained in RCW 7.48A.010 was overly broad to the extent it could be construed to include a normal and healthy interest in sex and not merely an interest that was morbid or shameful. However, the Court declined to strike down the statute in its entirety, reasoning that a limiting construction was possible. *Brockett,* at 504. Here, jury instructions given in Reece properly limited the statute.

Defendants also argue that the listing of "[v]iolent or destructive sexual acts" in RCW 7.48A.010(2)(b)(iii) is improper because it goes beyond the types of acts expressly contemplated in *Miller. Miller* gave "a few plain examples" of what a state could define for regulation. *See Miller,* at 25. However, *Miller* made clear these examples were not all encompassing and that the states were free to regulate, within constitutional guidelines, any form of "hard core" sexual conduct. *Miller,* at 27; *see also Ward,* at 773. Nor is

there any merit to defendants' argument that sadomasochistic materials must be combined with depictions of ultimate sex acts in order to qualify as obscene. It is sufficient that the material, taken as a whole, obscenely suggests intimate sexual activity. *See Mishkin v. New York,* 383 U.S. 502, 505–10, 16 L. Ed. 2d 56, 86 S. Ct. 958 (1966); *see also State v. Randall Book Corp.,* 53 Md. App. 30, 452 A.2d 187 (1982), *cert. denied,* 464 U.S. 919 (1983). The types of sadomasochistic materials proscribed by RCW 7.48A.010-(2)(b)(iii) are encompassed by the federal definition of obscenity. We conclude that RCW 9.68.140 and 7.48A.010 withstand scrutiny under the First and Fourteenth Amendments.

Defendants' main contention, however, is that even if these provisions can withstand scrutiny under the federal constitution, they are invalid under our state constitution. Defendants argue that Washington's free speech clause is broader than the First Amendment and must be independently construed. *See* Const. art. 1, § 5. In *Fine Arts Guild, Inc. v. Seattle,* 74 Wn.2d 503, 512, 445 P.2d 602 (1968), this court rejected this argument, reasoning that Const. art. 1, § 5 and the First Amendment were "in pari materia and inferentially interchangeable". However, in more recent years the court has in several instances given effect to textual differences between the two provisions. *See, e.g., Bering v. Share,* 106 Wn.2d 212, 233–34, 242–46, 721 P.2d 918 (1986), *cert. dismissed,* 93 L. Ed. 2d 990 (1987); *State v. Coe,* 101 Wn.2d 364, 375, 679 P.2d 353 (1984); *Alderwood Assocs. v. Washington Envtl. Coun.,* 96 Wn.2d 230, 635 P.2d 108 (1981); *Federated Publications, Inc. v. Kurtz,* 94 Wn.2d 51, 615 P.2d 440 (1980). In light of these decisions, the validity of Washington's criminal obscenity statute under Const. art. 1, § 5 is truly a matter of first impression.

## II
## OBSCENITY UNDER THE STATE'S FREE
## SPEECH GUARANTY

The United States Supreme Court has consistently held that state courts may interpret their own constitutions to be more protective of individual rights than the federal constitution. *See, e.g., Pruneyard Shopping Ctr. v. Robins,* 447 U.S. 74, 81, 64 L. Ed. 2d 741, 100 S. Ct. 2035 (1980); *Oregon v. Hass,* 420 U.S. 714, 719 & n.4, 43 L. Ed. 2d 570, 95 S. Ct. 1215 (1975). This court has frequently accepted that responsibility. *See, e.g., State v. Chrisman,* 100 Wn.2d 814, 817, 676 P.2d 419 (1984) (search and seizure); *State v. Fain,* 94 Wn.2d 387, 392, 617 P.2d 720 (1980) (cruel punishment); *Alderwood Assocs. v. Washington Envtl. Coun., supra* (free speech); *see generally* Utter, *Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights,* 7 U. Puget Sound L. Rev. 491 (1984).

The State argues that the criteria enunciated by this court in *State v. Gunwall,* 106 Wn.2d 54, 58–59, 720 P.2d 808 (1986) forecloses the application of independent state constitutional analysis to matters of obscenity. The State reasons that Washington has never developed an independent tradition of protecting obscene speech: "obscene or indecent" literature was criminalized both immediately prior to and after the ratification of the state constitution. *See* Laws of 1885, p. 122–23; Laws of 1891, ch. 69, § 24. The State further argues that reliance on federal obscenity doctrine is appropriate because this court has never held that Const. art. 1, § 5 extends broader protection to obscenity than does the First Amendment. For example, *Coe* rejected the idea that the state constitution's absolute prohibition of prior restraints should extend to traditionally unprotected

speech. *See Coe,* at 374–75 (citing *Fine Arts Guild, Inc. v. Seattle, supra).* We agree that Const. art. 1, § 5 should not be interpreted to afford greater protection to obscenity than that afforded by the federal courts under First Amendment analysis.

We hold that if a publication meets the federal test as an obscenity, it may be banned under both the state and federal constitutions. The magazine in Reece clearly is "obscene" under that test. The trial court in Reece correctly instructed the jury that to convict defendants it must find *Chains and Whips* was "lewd matter" and defined "lewd matter" as

> synonymous with obscene matter and means any matter:
> (A) Which the average person, applying contemporary community standards, would find, when considered as a whole, appeals to the prurient interest; and
> (B) Which the average person, applying contemporary community standards, would find explicitly depicts or describes patently offensive representations or descriptions of:
> Violent or destructive sexual acts, including but not limited to human or animal mutilation, dismemberment, rape, or torture; and
> (C) Which, when considered as a whole, and in the context in which it is used, lacks serious literary, artistic, political, or scientific value.

Instruction 14, Supplemental Clerk's Papers, at 16.

In Reece, the jury found the defendants guilty as charged. We are required as a reviewing court to make an independent constitutional determination of the obscenity of the publication in question here. *Tacoma v. Mushkin,* 12 Wn. App. 56, 59, 527 P.2d 1393 (1974) (citing *Jacobellis v. Ohio,* 378 U.S. 184, 12 L. Ed. 2d 793, 84 S. Ct. 1676 (1964)). After a review of the publication *Chains and Whips,* we conclude that the jury was correct in finding that by community standards the publication appeals to the prurient interest, is offensive by community standards, and lacks serious literary, artistic, political or scientific value.

The federal definition of obscenity spelled out in the 3–part *Miller* test is the constitutional threshold below which

the states may not go. The Washington courts have long allowed the Legislature to struggle with the attempt to regulate obscenity so long as the *Roth–Miller* test was met. *State v. Regan,* 97 Wn.2d 47, 640 P.2d 725 (1982). This task is one traditionally left to the Legislature. Prior Washington case law has consistently indicated that obscenity may be prohibited by criminal statute. *State v. Regan, supra; State v. Hull,* 86 Wn.2d 527, 546 P.2d 912 (1976); *State v. J–R Distribs., Inc.,* 82 Wn.2d 584, 512 P.2d 1049 (1973); *Fine Arts Guild, Inc. v. Seattle, supra; State v. Holedger,* 15 Wash. 443, 46 P. 652 (1896). In *State v. Coe, supra,* this court stated, "[W]e have expressly rejected an absolute bar against prior restraints on speech which is *not* constitutionally protected. *Seattle v. Bittner,* [81 Wn.2d 747, 757, 505 P.2d 126 (1973)] (obscenity); *Fine Arts Guild, Inc. v. Seattle,* 74 Wn.2d 503, 512–13, 445 P.2d 602 (1968) (obscenity)." *Coe,* 101 Wn.2d at 375.

██ The Washington Supreme Court has in the past and will continue in the future to accept its duty to interpret its constitution to be more protective of individual rights than the federal constitution. "We have often independently evaluated our state constitution and have concluded that it should be applied to confer greater civil liberties than its federal counterpart *when the reasoning and evidence indicate such was intended and is necessary.*" (Italics ours.) *Alderwood,* at 238. The *Gunwall* case has afforded guidance on when our constitution should be interpreted to extend broader rights than the federal constitution. In *State v. Gunwall, supra,* we set out six nonexclusive criteria to be used in determining the scope of protection provided by state constitutional provisions: (1) the language of the state constitution; (2) significant differences in language between parallel provisions of the federal and state constitutions; (3) constitutional history; (4) preexisting state law; (5) structural differences between the federal and state constitutions, and (6) whether the subject matter is of particular state or local concern. The proper

inquiry under *Gunwall* is not to ask whether state constitutional analysis is necessary, but to ask whether on a given subject matter the Washington constitutional provision should afford greater protection than the minimum protection afforded by the federal constitution. There is no presumption of adherence to federal constitutional analysis.

The question to be asked here is not whether the concept of free speech is interpreted more broadly under the state constitution than under the federal constitution. This court has already answered this question in the affirmative. *Bering v. Share, supra; State v. Coe, supra.* The question at issue here is whether *obscenity* is to be afforded broader protection under the state constitution than under the federal constitution.

The first two criteria of *Gunwall* direct the court's attention to the language of the state constitution and the parallel provision of the federal constitution. The language of article 1, section 5 is different from the language of the First Amendment. Const. art. 1, § 5 provides:

> Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right.

The First Amendment provides, in relevant part:

> Congress shall make no law . . . abridging the freedom of speech . . .

While this will always be the beginning of state constitutional analysis, it is not the end. If it were, the other criteria enunciated in *Gunwall* would be superfluous. As Justice Utter has pointed out, there are differences between statutory and constitutional construction. "[A] constitution is an expression of the people's will and depends for its validity on their ratification. Thus, the 'common and ordinary meaning' in which the constitution's words must be construed is the meaning they would have had to the vast majority of ordinary voters". Utter, *Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights,* 7 U. Puget Sound L. Rev. 491, 510 (1984). It is therefore relevant to

note that obscenity was criminalized both immediately prior to and after the ratification of the state constitution. *See* Laws of 1885, p. 122–23; Laws of 1891, ch. 69, § 24, p. 126.

The third *Gunwall* factor directs the court to ask whether the "[s]tate constitutional and common law history" reflect an intention to confer greater protection from the state government than has been afforded by the federal constitution. *Gunwall,* at 61. Historical analysis is relevant though not necessarily dispositive in a question of state constitutional interpretation. The court should be free to consider current values and conditions as one factor in interpreting the state constitution. *See* Utter, 7 U. Puget Sound L. Rev. at 524. However, on the question of protection for obscene material, there is no clear conflict between Washington common law history and current values and conditions. Obscenity has never enjoyed constitutional protection in Washington and the court does not perceive current conditions to warrant such protection.

*Gunwall* also directs the court's attention to preexisting state law which "can thus help to define the scope of a constitutional right later established." *Gunwall,* at 62. As noted above, obscenity was criminalized prior to the ratification of article 1, section 5 of the Washington State Constitution. Neither statutory law nor case law in Washington have ever afforded protection for obscene speech. *See, e.g., State v. Regan, supra; State v. Hull, supra; State v. J–R Distribs., Inc., supra; Fine Arts Guild, Inc. v. Seattle, supra.* Early legislative construction of a provision should be given great weight, especially if it extended over a long period of time. Similarly, early constructions by the courts are relevant to the intent of various constitutional provisions. Utter, 7 U. Puget Sound L. Rev. at 521.

Other state supreme courts, in construing their state constitutional free speech guaranties which are very similar to the wording of article 1, section 5, have refused to extend state constitutional protection to obscene expression that

under the federal test does not enjoy constitutional protection. *Portland v. Jacobsky,* 496 A.2d 646 (Me. 1985); *People v. Neumayer,* 405 Mich. 341, 275 N.W.2d 230 (1979). *Neumayer* recognized that the language of article 1, section 5 of the Michigan Constitution (virtually identical to article 1, section 5 of the Washington Constitution) in certain instances may confer broader protection upon certain types of expression than the First Amendment. However, that court rejected the notion that obscenity is protected by the state constitution.

The fifth *Gunwall* criteria considers the difference in the structure between the federal and state constitutions, and notes that the federal constitution is a grant of enumerated powers, while the state constitution acts as a limitation on the otherwise plenary powers of state government. *Gunwall,* at 62. This distinction simply reinforces the responsibility the Washington court has to engage in independent state analysis and afford broader protection when necessary. Often state and federal constitutions have conferred the same protection. *Alderwood Assocs. v. Washington Envtl. Coun.,* 96 Wn.2d 230, 238, 635 P.2d 108 (1981) (citing *Young v. Konz,* 91 Wn.2d 532, 588 P.2d 1360 (1979); *Hillside Comm'ty Church, Inc. v. Tacoma,* 76 Wn.2d 63, 455 P.2d 350 (1969)). However, there is no presumption that the minimum degree of protection established by the federal constitution is the degree of protection to be afforded under the Washington Constitution.

*Gunwall* also advises the court to ask whether the matter is of particular state or local interest or whether there is a need for national uniformity. *Gunwall,* at 67. Although there is some interest in uniformity because of interstate traffic in publications, obscenity is largely a local concern. The local nature, however, does not militate in the area of obscenity for enhanced state constitutional protection for obscene material.

Prior reliance on federal precedent and federal constitutional provisions does not preclude this court from taking a more expansive view under the Washington Constitution,

especially *where the United States Supreme Court determines to limit federal guaranties in a manner inconsistent with our prior pronouncements. State v. Jackson,* 102 Wn. 2d 432, 439, 688 P.2d 136 (1984). However, it does not follow, especially where the federal protections have not been curtailed, that we will automatically cease to follow our own precedents merely because they have tracked the federal precedents.

*Gunwall* recognized that "[t]he opinions of the Supreme Court, while not controlling on state courts construing their own constitutions, are nevertheless important guides on the subjects which they squarely address." *Gunwall,* at 61 (quoting *State v. Hunt,* 91 N.J. 338, 450 A.2d 952 (1982) (Handler, J., concurring)). Obviously, this court need not construe article 1, section 5 as the federal courts have construed the First Amendment. However, this court may find federal reasoning persuasive even while construing our own constitution.

The language of article 1, section 5 is significantly different from the First Amendment and often will support a broader protection for free speech in Washington. The narrow inquiry in this case is whether "obscene" speech (*see State v. Regan,* 97 Wn.2d 47, 640 P.2d 725 (1982)) deserves broader protection under article 1, section 5 than it is afforded by the federal case law construing the First Amendment. After consideration of the *Gunwall* criteria and in light of state constitutional history and preexisting state law, we conclude that in the limited area of obscene speech, article 1, section 5 does not afford broader protection.

One final constitutional argument is raised by defendants, namely, that RCW 9.68.140 and 7.48A.010 are void ab initio because they were enacted pursuant to an invalid emergency clause in contravention of the guaranteed right to referendum under Const. art. 2, § 1. This argument was recently addressed and rejected in *State v. Hayes,* 108 Wn.2d 344, 738 P.2d 276 (1987).

## III
### OTHER CLAIMS OF ERROR

Defendants in Reece raise various claims of error in addition to their constitutional claims. First, defendants argue that even if RCW 7.48A.010 and 9.68.140 are constitutional, the publication *Chains and Whips* does not as a matter of law constitute obscene material because it depicts merely bondage and fetishism and not the sort of "[v]iolent or destructive sexual acts" required under the statute. We disagree. The magazine depicts nude and scantily clad persons engaged in acts of flagellation, beatings and torture. There is a strong intimation of sexual behavior. Although the pictures are clearly simulated, they nonetheless represent "[v]iolent or destructive sexual acts" within the meaning of RCW 7.48A.010(2)(b)(iii).

Defendants in Reece further argue that the prurient appeal of materials such as *Chains and Whips* which are aimed at a deviant subgroup must be established by some evidence in addition to the materials themselves. They contend the prosecutor's failure to provide such evidence deprived them of due process and violated RCW 9A.04.100 which requires that each element of a crime be proved "by competent evidence beyond a reasonable doubt."

In *State v. J–R Distribs., Inc.*, 82 Wn.2d 584, 597–98, 512 P.2d 1049 (1973), *cert. denied*, 418 U.S. 949 (1974), this court held that no evidence other than the allegedly obscene material itself is required as a matter of federal law (citing *Kaplan v. California*, 413 U.S. 115, 37 L. Ed. 2d 492, 93 S. Ct. 2680 (1973)). Yet, neither *J–R Distribs.* nor the federal cases on which it relied dealt with materials depicting bondage, fetishism and torture, as opposed to more commonplace sexual conduct. *United States v. Klaw*, 350 F.2d 155, 166–67 (2d Cir. 1965) held that the prurient appeal of "bondage" booklets is beyond the knowledge of ordinary jurors and must therefore be established with extrinsic evidence. However, the United States Supreme Court has since expressly reserved judgment on whether expert testimony is necessary to explain the prurient appeal

of deviant oriented materials. *See Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 56 n.6, 37 L. Ed. 2d 446, 93 S. Ct. 2628 (1973); *see also State v. Summers,* 692 S.W.2d 439, 445 (Tenn. Crim. App. 1985) (concluding that expert testimony was not required to prove prurient appeal of a film depicting various forms of sadomasochistic conduct).

■ We find that expert testimony is not required to establish the obscene nature of materials aimed at a deviant subgroup. The obscenity test requires jury determination of an abstract standard in light of collective experience. Such a standard is not unlike criminal negligence crimes, where expert testimony is not required, in which the jury must find that the defendant's conduct grossly deviated from that of the ordinary reasonably prudent person. *See* RCW 9A.08.010(1)(d).

■ Defendants next argue that there was insufficient evidence to show that defendants Reece and Styers were operating for "profit–making purposes" as is required under RCW 9.68.140. The statute does not specially define the meaning of the phrase "profit–making purposes". Defendants argue that because Reece was a salaried employee and Styers was paid an hourly wage, they did not act for "profit–making purposes". Defendants also contend the Legislature did not intend for RCW 9.68.140 to reach mere employees. We reject defendants' arguments. The magazines at issue here were sold above the wholesale cost, and profit was made. The fact that the defendants did not personally receive a commission and had no proprietary interest in the business does not negate the fact that their actions were done for the purpose of making a profit.

This court has often recognized that a statute must be read to avoid absurd results. *See, e.g., General Tel. Co. v. Utilities & Transp. Comm'n,* 104 Wn.2d 460, 471, 706 P.2d 625 (1985). Defendants' construction would lead to an exemption for nonprofit corporations. Thus, entrepreneurs could set up a nonprofit corporation, pay themselves a salary, and thereby insulate their activities from prosecution under the statute. In addition, defendants' construction

would exempt corporations, even J–R Distributors, which operate at a "loss" rather than a "profit". It is absurd to suggest that the Legislature intended the result reached by defendants' construction. We conclude that all those whose actions further "profit–making purposes" come within the purview of the statute. The evidence was sufficient to show that defendants Reece and Styers, as bookstore employees, were operating for "profit–making purposes".

## IV
### CONCLUSION

We conclude that RCW 9.68.140, to the extent it proscribes obscenity as defined in RCW 7.48A.010, comports with both state and federal constitutional requirements. We affirm the convictions in Reece; we reverse and remand for trial in J–R Distributors.

DOLLIVER, DORE, ANDERSEN, and DURHAM, JJ., concur.

ANDERSEN, J. (concurring with majority)—I agree with much of what Justice Utter writes in his dissent concerning the breadth of the state constitution's protection of free speech and press. As the majority opinion explains, however, *obscenity* has never been protected by either the state or the federal constitutions.

UTTER, J. (dissenting)—The constitutional protection of free speech is one of the noblest and most courageous foundations of our nation and our state. It is sadly ironic that this protection is being used by those who would degrade our society. However, it is in the context of determining to protect speech that we find to be demeaning and repugnant that our true commitment to the doctrine is tested.

The gist of the majority's analysis is that, despite the explicit language of Const. art. 1, § 5, it does not protect expression that was the subject of a statute near the time of the ratification of our constitution. I find, in spite of my

personal repulsion with the subject matter, that nonetheless I am mandated to follow the explicit language of our constitution to afford protection to speech on "all subjects," whether or not this provides broader protection than the United States Constitution. Therefore, I dissent.

As an initial matter, we must define the issue before us. The relevant statute does not limit itself to "the interests of unwilling viewers, captive audiences, minors and beleaguered neighbors", *State v. Henry,* 302 Or. 510, 525, 732 P.2d 9 (1987), but instead absolutely forbids access by consenting adults to the offending material. Even a finding that RCW 9.68.140 is unconstitutional would not, as the Oregon Supreme Court stated in *Henry,* "rule out regulation, enforced by criminal prosecution, directed against conduct of producers or participants in the production of sexually explicit material, nor reasonable time, place and manner regulations of the nuisance aspect of such material or laws to protect the unwilling viewer or children." *Henry,* at 525. The issue is not whether regulation is possible, but how such materials will be regulated.

Citizen action can be highly effective in curtailing the unwelcome spread of pornography. In his book, *Kingdoms in Conflict* (1987), Charles Colson relates a story of a successful citizen effort, at pages 262–63:

> When Jack Eckerd, founder of the Eckerd Drug chain, became a Christian in 1983, he called the company president and urged him to take *Playboy* and *Penthouse* magazines out of the Eckerd stores. The executive protested, telling him the magazines amounted to several million dollars a year in business. Jack Eckerd persisted. Eventually all 1,700 Eckerd drugstores stopped carrying *Playboy* and *Penthouse.* Eckerd then wrote to the directors of other retail stores and encouraged them to do the same. When his letters went unanswered, he wrote again. [Footnote: This story is told in more detail in Jack Eckerd, *Finding the Right Prescription* (Old Tappan, N.J.: Revell, 1987).]
>
> Meanwhile, the National Coalition Against Pornography was picketing and boycotting stores selling "adult" magazines. The pressure began to pay off. One by one

Revco, People's, Rite Aid, Dart Drug, Gray Drug, and High's Dairy Stores pulled pornography from their shelves. And finally 7–11 removed these magazines from its 4,500 stores and recommended that its 3,600 franchises do the same.

Thus, without one debate before Congress or one case entangled in the courts, the shelves of nearly 12,000 retail stores were cleared of pornography!

*Playboy*'s lawyers, shocked at their declining circulation, charged that a letter from the Meese Commission had put coercive pressure on the stores. Maybe so. But the real impetus came from the little platoons—thousands of individuals and one courageous man who put his faith into practice in his own business.

The sole question presented for this court to decide is the constitutionality of a statute that forbids at any time or place the sale to consenting adults of literature that does not comport with "a uniform vision of how human sexuality should be regarded and portrayed." L. Tribe, *American Constitutional Law* § 12–16, at 662 (1977).

The majority purports to apply the six nonexclusive criteria of *State v. Gunwall,* 106 Wn.2d 54, 720 P.2d 808 (1986) as interpretive guides to determine Const. art. 1, § 5 does not protect obscenity. A closer examination reveals that the majority's *Gunwall* analysis is incorrect and reaches the wrong result.

## LANGUAGE

The majority does not even grant the express language of Const. art. 1, § 5 the dignity of a discussion, other than to state that the language is the beginning of state constitutional analysis. Instead of attempting to determine what the language of the provision means, the majority states that concentration on the language of the constitutional provision would make the other *Gunwall* criteria superfluous. Majority, at 778. However, if the text of a constitutional provision is unambiguous, further construction can be unwarranted. *State ex rel. Anderson v. Chapman,* 86 Wn.2d 189, 191, 543 P.2d 229 (1975).

Const. art. 1, § 5 provides:

Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right. Because we are asked in this case to consider the constitutionality of a ban on certain obscene materials, the relevant inquiry is whether such speech falls within the constitutional provisions allowing persons to "freely speak" on "all subjects".[1]

The majority correctly notes that in interpreting the words of the constitution, we should consider their common meaning. *State v. Brunn,* 22 Wn.2d 120, 139, 154 P.2d 826, 157 A.L.R. 1049 (1945); *see also State ex rel. O'Connell v. Slavin,* 75 Wn.2d 554, 557, 452 P.2d 943 (1969). Instead of doing so, however, the majority looks to the statutory context. Majority, at 778.

The language of Const. art. 1, § 5 unambiguously protects speech on *all* subjects, which must include the subjects listed in RCW 7.48A.010. Const. art. 1, § 5 allows the citizens of this state to "freely speak" on those subjects. The relevant dictionary definitions of the terms "free" and "freely" contain the concept of being "unrestrained" or "without hindrance." *Webster's Third New International Dictionary* 904, 906 (1981); 4 *Century Dictionary and Cyclopedia* 2366, 2369 (1913). The adjective "free" modifying "speech" means "[c]haracterized by liberty in the expression of sentiments or opinions; uttered or expressed without reserve; frank, plain–spoken." 4 *Oxford English Dictionary* 522 (25) (1933). In literature written shortly before the ratification of our constitution, "free" as a modifier of "speech" took the meaning "[n]ot observing due bounds, 'loose', licentious." 4 *Oxford English Dictionary* 522 (25)(b) (1933) (citing Thackeray and Tennyson). Because the language of Const. art. 1, § 5 is unambiguous in protecting speech, even the offensive speech listed in RCW

---

[1]The issue of whether the distribution of the materials at issue in this case might constitute an "abuse" of the right to free speech is not at issue here because there is no allegation of direct harm resulting from the materials. *See Bering v. Share,* 106 Wn.2d 212, 721 P.2d 918 (1986), *cert. dismissed,* 479 U.S. 1050, 93 L. Ed. 2d 990, 107 S. Ct. 940 (1987).

7.48A.010, we need look no further in our constitutional interpretation. *State ex rel. Anderson,* at 191.

## DIFFERENCES IN LANGUAGE

The majority does not address the second *Gunwall* criterion, other than to note that the language of Const. art. 1, § 5 and the first amendment to the United States Constitution differ. Majority, at 778. In fact, this court has consistently held in the most recent cases addressing this issue that the very different languages of the two constitutions require giving our constitution a broader interpretation. *Bering v. Share,* 106 Wn.2d 212, 245, 721 P.2d 918 (1986), *cert. dismissed,* 479 U.S. 1050, 93 L. Ed. 2d 990, 107 S. Ct. 940 (1987); *State v. Coe,* 101 Wn.2d 364, 374, 679 P.2d 353 (1984); *Alderwood Assocs. v. Washington Envtl. Coun.,* 96 Wn.2d 230, 635 P.2d 108 (1981).

The United States Supreme Court has determined that obscenity does not fall under the free speech protection of the First Amendment. *E.g., Miller v. California,* 413 U.S. 15, 37 L. Ed. 2d 419, 93 S. Ct. 2607 (1973). Thus, under the United States Constitution, there is such a thing as "unprotected speech." The Washington Constitution, on the other hand, leaves no room for "unprotected speech" to exist. It protects speech on "all subjects". It is hard to imagine how the language of our constitution could be less unambiguous in its absolute protections of speech.

## CONSTITUTIONAL AND COMMON LAW HISTORY

"The history of the adoption of a particular state constitutional provision may reveal an intention that will support reading the provision independently of federal law." *Gunwall,* at 61. Before the Preamble and Bill of Rights Committee adopted the language that was to become Const. art. 1, § 7, it considered several proposals for the language and produced two formal drafts. *See* Utter, *The Right To Speak, Write, and Publish Freely: State Constitutional Protection Against Private Abridgment,* 8 U. Puget Sound L. Rev. 157 (1985). The language finally adopted is the

most protective of rights to free speech of the drafts considered. *State v. Rinaldo,* 36 Wn. App. 86, 93, 673 P.2d 614 (1983), *aff'd,* 102 Wn.2d 749, 689 P.2d 392 (1984) (some of the reasoning of the Court of Appeals was questioned by the plurality).

> Those hardy frontier lawyers, newspaper people and their colleagues at the 1889 constitutional convention said it as clearly as they possibly could—the right to free speech and press in the State of Washington is a privilege guaranteed to all, and so long as it is not abused is absolute. Then to insure that this right would not be tampered with by future legislatures or courts, they wrote the privilege into our state constitution.

*Rinaldo,* at 93–94. The history behind the adoption of Const. art. 1, § 5 supports giving this provision the most liberal interpretation possible.

### PREEXISTING LAW

In *State v. Gunwall,* 106 Wn.2d 54, 720 P.2d 808 (1986), we recognized "preexisting state law" as one of the noninclusive factors that may be of benefit in determining the coverage of the Washington Constitution:

> Previously established bodies of state law, including statutory law, may also bear on the granting of distinctive state constitutional rights. State law may be responsive to concerns of its citizens long before they are addressed by analogous constitutional claims. Preexisting law can thus help to define the scope of a constitutional right later established.

*Gunwall,* at 61–62. The majority relies on the fact that there were statutes penalizing the distribution of obscene material before and after the ratification of the Washington Constitution (Laws of 1885, p. 122–23; Laws of 1891, ch. 69, § 24) to conclude that obscenity is not protected. This analysis is misguided.

The true focus of this *Gunwall* factor should be on whether the constitution responds to a concern already addressed by legislation. An example of how this analysis should apply is found in *Gunwall* itself. This court found the fact that this state has a long history of extending

strong protections to telephonic communications lends strong support to extending broader protections under the state constitution than the United States Constitution for such communications. *Gunwall,* at 66.

The majority's approach is to *limit* the scope of a constitutional provision through statutes that violate its explicit terms. This is surely unintended. If anything is clear it is that the constitution overrides statutes. Const. art. 27, § 2 (only laws that are not repugnant to the constitution remain in force). The fundamental strength of the constitution is that it forces us, having declared basic principles, to apply those principles uniformly, even if such a result may not be popular in some instances and even where we must nullify a statute. *See* Const. art. 1, § 32 (fundamental principles).

The majority's analysis would seem to diminish the dignity and courage of our constitution, which was designed to protect speech even where it is repugnant to the majority of citizens. Moreover, the majority has not considered how its analysis would require us to find constitutional restrictions of free speech simply because such restrictions were part of the statutory scheme around the time of the ratification of the constitution. In fact, the logical extension of the majority's analysis, which in essence relies exclusively on the existence of statutes at the time of the ratification of the constitution as defining the scope of a constitutional protection, is that statutes enacted in the late 19th century have special immunity from constitutional challenges and can in fact control now in situations far from the intent of drafters of those statutes.

As discussed above, a finding that RCW 9.68.140 is unconstitutional does not prevent regulation of the pornography industry and reasonable time, place and manner restrictions. A successful struggle against pornography can be waged without the passage of laws that effectively totally ban offensive expression.

VAGUENESS AS PRIOR RESTRAINT

The majority does not address appellants' challenge that RCW 9.68.140 and RCW 7.48A.010 are vague and thus act as an unconstitutional prior restraint against speech. A law is unconstitutional "when it forbids conduct in terms so vague that persons of common intelligence must guess at its meaning and differ as to its application." *Burien Bark Supply v. King Cy.,* 106 Wn.2d 868, 871, 725 P.2d 994 (1986). Where a statute involves speech, vagueness is not tolerable. "[S]tandards of permissible statutory vagueness are strict in the area of free expression." *NAACP v. Button,* 371 U.S. 415, 432, 9 L. Ed. 2d 405, 83 S. Ct. 328 (1963). The roots of the vagueness doctrine are in constitutional protections of due process. *See Seattle v. Drew,* 70 Wn.2d 405, 408, 423 P.2d 522, 25 A.L.R.3d 827 (1967).

In *State v. Henry,* 302 Or. 510, 732 P.2d 9 (1987), the Oregon Supreme Court considered the constitutionality of an obscenity statute under the Oregon Constitution. Although it resolved the case by determining that "all subjects" in its constitution encompasses obscenity, it also approved of the holding of the Oregon Court of Appeals that statutes defining obscenity by contemporary community standards are inherently vague:

> The indeterminacy of the crime created by [the obscenity statute defined by the *Miller* test] . . . lies in tying the criminality of a publication to "contemporary state standards." Even in ordinary criminal law, we doubt that the legislature can make it a crime to conduct oneself in a manner that falls short of "contemporary state standards." In a law censoring speech, writing or publication, such an indeterminate test is intolerable. It means that anyone who publishes or distributes arguably "obscene" words or pictures does so at the peril of punishment for making a wrong guess about a future jury's estimate of "contemporary state standards" of prurience.

(Footnotes omitted.) *State v. Henry, supra* at 513. I find this analysis compelling. Equally compelling is Justice Brennan's dissent in *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 87–88, 37 L. Ed. 2d 446, 93 S. Ct. 2628 (1973):

[E]ven the most painstaking efforts to determine in advance whether certain sexually oriented expression is obscene must inevitably prove unavailing. For the insufficiency of the notice compels persons to guess not only whether their conduct is covered by a criminal statute, but also whether their conduct falls within the constitutionally permissible reach of the statute. The resulting level of uncertainty is utterly intolerable, not alone because it makes "[b]ookselling . . . a hazardous profession," but as well because it invites arbitrary and erratic enforcement of the law.

(Citation omitted.)

Although the United States Supreme Court has not been convinced that its obscenity definition is vague under the United States Constitution, this definition, and the definition of RCW 7.48A.010 violate the Washington Constitution, even without invoking principles of due process. Vague restraints on the freedom of speech act as prior restraints of speech. In *State v. Coe,* 101 Wn.2d 364, 374, 679 P.2d 353 (1984), we stated that the plain language of Const. art. 1, § 5 precludes prior restraints, leaving the State with only post–publication sanctions to punish abuse of free speech rights. One type of prior restraint is an order prohibiting publication, such as this court held unconstitutional in *Coe.* Even less tolerable is a prior restraint in the form of a vague statute, which necessarily results in heavy self–censorship to avoid criminal prosecution. The reason this is even less tolerable is that the materials restrained are not clearly and narrowly defined, and so there will be a broad range of materials suppressed as the publisher attempts what can only be a guess at what speech will offend community standards.

I would hold that Const. art. 1, § 5 protects speech on all subjects, including the subjects listed in RCW 9.68.140 and RCW 7.48A.010. The Legislature and citizens of this state have many legitimate means to combat pornography, but a total ban on the publication or sale of materials that offend community standards is not one of them. Moreover, the

vague definitions in RCW 7.48A.010 act as an unconstitutional prior restraint on the freedom of speech. I would reverse the convictions.

PEARSON, C.J., and BRACHTENBACH, J., concur with UTTER, J.

CALLOW, J.—I concur in Justice Utter's comments on the unconstitutionality of RCW 7.48A.010 and 9.68.140 in light of Const. art. 1, § 5. I cannot embrace the suggestion that economic coercion is acceptable as a method for suppressing the dissemination of ideas.

Reconsideration denied March 23, 1989.